IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2019 Session

**BRADLEY TOWNSEND v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Roane County**
**No. 12376    Jeffery Hill Wicks, Judge[1]**

_____

**No. E2018-01052-CCA-R3-PC**
_____

The Petitioner, Bradley Townsend, appeals the Roane County Criminal Court's denial of his petition for post-conviction relief from his two convictions of aggravated sexual battery, a Class B felony, and resulting sentence of eight years. On appeal, he contends that he received ineffective assistance of counsel because trial counsel failed to request jury instructions on certain lesser-included offenses. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner received the ineffective assistance of counsel with regard to his conviction of aggravated sexual battery in count twenty-one. Therefore, we reverse the judgment of the post-conviction court as to that count and remand the case to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part and Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Alan R. Moore, Lenoir City, Tennessee, for the appellant, Bradley Townsend.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Russell Johnson, District Attorney General; and Robert Edwards, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

_____

[1] Judge Wicks did not preside over the Petitioner's trial.

The Petitioner was indicted in count one for aggravated sexual battery and in counts two through twenty-two for rape of child based on acts he allegedly committed against his eight-year-old stepdaughter over the course of a five-month period. The Petitioner went to trial in 2003. At the close of the proof, the trial court instructed the jury on aggravated sexual battery in count one but did not instruct the jury on any lesser-included offenses. The trial court instructed the jury on rape of a child in counts two through twenty-two and the lesser-included offense of aggravated sexual battery. The jury convicted the Petitioner of aggravated sexual battery as charged in count one of the indictment for an offense that occurred on April 9, 2000, and of aggravated sexual battery as a lesser-included offense of rape of a child in count twenty-one for an incident that occurred on April 7, 2000. The jury acquitted him of the remaining twenty counts of rape of a child.

On direct appeal of his convictions, this court summarized the proof at trial as follows:

On April 9, 2000, the victim's mother witnessed an episode that led her to believe that the defendant was sexually molesting her eight-year-old daughter. After questioning the victim, she contacted the sheriff's department and took the victim to the hospital for a physical examination. Based in part on the results of that examination, as well as statements by the victim and the victim's mother, the Roane County Grand Jury returned an indictment on June 20, 2000, charging the defendant with one count of aggravated sexual battery, twenty-one counts of rape of a child, and one count of perjury. The perjury count of the indictment, however, was dismissed prior to trial.

The victim's mother . . . testified at the August 2003 trial that she married the defendant in November 1999 and divorced him in January 2001 after she learned that he had been sexually abusing the victim. At the time the events in the case transpired, she and the defendant lived together in Kingsport with her two children from a previous relationship: the victim, who was then eight years old, and the victim's younger brother . . . who was approximately six. In addition, the defendant had every-other-weekend custody of his six-year-old son[.]

[The victim's mother] testified that the defendant was unemployed from November 1999 through April 2000 and during those months regularly awakened the children in the mornings while she prepared for work. She said she began to develop some vague concerns about his relationship with the victim a few weeks prior to the Sunday, April 9, incident she witnessed, but nothing definite occurred to arouse her suspicions until Friday morning, April 7. On that morning, she stepped out

of her bathroom to find the defendant in her bed with the victim. [The victim's mother] explained that the victim had slept with her upstairs the previous night while the defendant had slept downstairs with [the victim's younger brother]. She said the defendant jumped when he saw her and said, "[O]h, you scared me," which "didn't give [her] a good feeling."

[The victim's mother] testified that on April 9 she asked the defendant to go downstairs to attend to the laundry while she was upstairs cooking. While the defendant was downstairs, [the victim's younger brother], who had cerebral palsy, ADHD, and obsessive-compulsive disorder, began repeatedly calling to him from his high chair. Because something in the tone of the defendant's voice as he called back to [the victim's younger brother] to wait a minute aroused her suspicions, she removed her shoes, tiptoed downstairs, and looked in the victim's bedroom. There, she saw the victim sitting on the defendant's lap with her dress partially hiked up and her legs spread over the defendant's legs while the defendant rubbed her vagina on the outside of her panties. [The victim's mother] recalled that she could see an obvious crease where the victim's panties had been pushed up into the folds of her vagina.

[The victim's mother] testified that when the defendant saw her, he jerked his hand away. She said she walked over to him and took hold of the victim's arms to pull her off his lap, but he held her by the waist in an effort to keep her in place. When she finally jerked hard enough to pull the victim from him, she saw that he had an erection. Remaining calm, she requested that he accompany her into the hall, where she asked him what he had been doing. The defendant, who was visibly nervous, told her that he had just been touching the inside of the victim's leg. In response, she told him what she had seen and did not want to discuss it further. [The victim's mother] said that the defendant was on his way to a funeral and that he left the house approximately thirty minutes later, at about 7:00 p.m.

[The victim's mother] testified that after the defendant left she went downstairs and questioned the victim about the incident. She said she had asked the victim approximately a year before if the defendant had ever touched her inappropriately and that she said he had not. On this occasion, however, the victim told her that it happened "practically every morning" and whenever [the victim's mother] was not at home. Questioned more closely, the victim told her that it occurred during the week in which the children had stayed home from day care with the defendant and when [the defendant's son] was at the home for his weekend visitation. [The victim's mother] testified that, based on what the victim told her, she was able to determine the specific dates of the offenses by consulting her calendar. She

stated that the victim herself was able to identify two specific incidents by date: April 3 and April 7, 2000. She said the victim told her that "something was happening" on April 7 when [the victim's mother] came out of the bathroom to find the defendant in her bed with the victim, and that April 3 was the last time she remembered the defendant's penetrating her. [The victim's mother] testified that after talking to the victim, she went to the Roane County Sheriff's Department and spoke with a detective and a representative from the Department of Children's Services ("DCS"). She said she never again shared a home with the defendant and subsequently divorced him.

On cross-examination, [the victim's mother] acknowledged that she and the defendant initially kept their marriage a secret because his mother was opposed to their union. She acknowledged that the defendant lived and worked in Chattanooga for the first two months of their marriage until she asked him to quit his job and move to Kingsport to be with her because she was pregnant and did not want to live apart. She conceded that the defendant worked sporadically as a roofer after he moved to Kingsport and therefore, contrary to her direct examination testimony, was not completely unemployed during that time. [The victim's mother] further acknowledged that she did not see the defendant doing anything to the victim on the morning of April 7; that the victim regularly shared the victim's double bed with [the victim's younger brother] and with [the defendant's son] during his weekend visits, which meant that both boys were present in bed with the defendant and the victim when some of the alleged incidents occurred; and that neither [the victim's younger brother] nor [the defendant's son] had ever said anything to her about the incidents. [The victim's mother] also acknowledged she never found any evidence of blood or semen on the victim's clothing or bedding.

When questioned about the April 9 incident, [the victim's mother] expressed her certainty that she saw the defendant rubbing the victim's vagina, testifying that she watched the episode for approximately five seconds to be sure of what she saw before she intervened. She acknowledged she said nothing about the defendant's erection to a nurse during the May 1, 2000, visit to the Children's Hospital but insisted she had mentioned seeing the erection during her testimony at the first preliminary hearing, in which "the tape was no good." She testified, initially, that she had also mentioned, at the second preliminary hearing, having seen the defendant's erection when she pulled the victim from his lap. However, when defense counsel told her she was wrong, she apparently conceded her mistake, saying, "Sorry." She acknowledged she had testified at that same hearing that she grabbed the defendant's crotch when they went into the

hall, which was a detail she had neglected to mention during her direct examination trial testimony. Finally, she acknowledged that, after grabbing the defendant's crotch, she said something to him along the lines of she was sorry for thinking he had done something and that her hormones were acting up because she was pregnant.

Dr. John Williams, a specialist in pediatric emergency medicine, testified that he was on duty at the East Tennessee Children's Hospital during the late evening hours of April 9, 2000, when the victim's mother and a representative from Roane County Children's Services brought the victim to the hospital for an examination. He said he found no signs of bleeding or bruising on the victim and no abnormal dilations of her vagina or anus. He did, however, find a small tear to the victim's hymen, which, he said, "could [have] happen[ed] a multitude of different ways." Although he was unable to tell the exact time the injury occurred, he did not believe it had occurred within the "past hours to day" because he saw no signs of dried blood around the edges of the tear. Dr. Williams testified that injuries to the vagina heal quickly due to the area's rich blood supply and that it was possible for a tear to the hymen to heal without leaving any trace of injury. Therefore, he was not surprised to learn that the physician who examined the victim three weeks later was unable to detect the injury. Dr. Williams testified that, according to the literature he had reviewed, in approximately 75% of child sexual abuse cases the child's physical examination is normal. He stated that, based on his findings, he was unable to determine if the victim had been sexually penetrated.

On cross-examination, Dr. Williams acknowledged that the victim's hymen was intact with the exception of the defect or "questionable tear" that he had noted. He testified that the victim was consistent when describing digital penetration but inconsistent when describing penile penetration, in that her answers were not the same each time he asked her about it. He said he was not aware of any allegation of anal penetration at the time he performed the physical exam. He testified that the term "R/O sexual abuse," which he had written on the victim's medical records, meant "rule out sexual abuse." On redirect examination, he clarified that he wrote the term to reflect the reason the victim had been brought to the hospital and not to indicate that his physical examination had ruled out that she had been the victim of sexual abuse.

Linda Booth testified she was currently a 9-1-1 dispatcher but formerly worked as a detective with the Roane County Sheriff's Department and in that capacity spoke by telephone with the victim's mother on the evening of April 9, 2000. Based on that conversation, she

arranged for a DCS worker to meet the victim and the victim's mother at the Children's Hospital. The next morning, the defendant was brought from the jail to her office for an interview. During the interview, the defendant provided his version of the previous evening's incident, telling her that the victim's dress had been up and that his hands had been "like this," as he stood and demonstrated by placing his hands on his upper inner thighs. Referring to her notes, Booth testified that, during the course of the interview, the defendant also said that the victim's mother believed the victim because she had no reason to disbelieve her; described himself as "real sexually active"; asked whether there would not have been blood if he had penetrated the victim with his finger or his penis; said the victim was "real sexual"; told her that he got in bed with the children in the mornings; and said that he liked to cuddle with the victim. Booth identified the following written statement the defendant completed during the interview, which she read aloud for the jury:

> I don't know why [the victim] would say these things. I have tried to be the best stepfather I know how to be. When I would go to get in bed in the mornings with her, nothing inappropriate ever happened. She is my daughter and I love her very much. I could never do such a thing to any child.

On cross-examination, Booth acknowledged that she did not tape the interview and that it was possible the defendant had made other comments besides the statements she recorded in her notes. She testified she had written down everything she thought pertinent but admitted she had not recorded the questions she asked the defendant during the interview. She further acknowledged that she never questioned [the victim's younger brother] or [the defendant's son] about the incidents. In explanation, she testified that the victim had told her that both boys were asleep when the incidents occurred. Finally, she conceded she swore out the defendant's arrest warrant after talking with the victim's mother and the DCS worker, who told her that the victim's physical examination had confirmed vaginal penetration.

The victim began her testimony by relating the April 9, 2000, incident that occurred in her bedroom, testifying that she was sitting on the defendant's lap watching television and the defendant was rubbing her on her front privates when her mother walked into the room and pulled her off his lap. She stated that the defendant was sitting on the couch in her bedroom, that her legs were over the outside of his legs, and that she believed "Smart Guy" was playing on the Disney Channel at the time. She testified that the defendant initially tried to hold her down as her mother

pulled on her but that her mother succeeded in pulling her off his lap. She said her mother then asked the defendant to go into the hall with her. Later, after the defendant had left the house, her mother talked to her about what the defendant had been doing to her.

The victim testified that she had told her mother "no" on previous occasions when she had asked if the defendant had ever touched her inappropriately, even though he had, because she was scared and knew her mother loved the defendant. However, when her mother asked her again on the evening of April 9, she told her everything. The victim testified that the inappropriate touching "happened all the time." Referring to her vagina and anus as her front and rear private parts, respectively, and the defendant's penis as his front private part, she testified that the defendant regularly got into her bed with her in the mornings and, depending on her position at the time, put either his finger or his penis in her vagina or anus. She said the defendant once asked her if what he was doing "felt good," and she told him "no." She agreed that her brother slept in the bed with her and that the defendant's son slept there as well whenever he stayed over. She said that the defendant was always quiet and that she did not know whether the boys knew what was happening. She testified that she told her mother that the incidents happened during a week in which she stayed home from day care and during the times when the defendant's son was visiting in the home.

The victim testified that she usually slept in a long t-shirt and underwear. She said that on the Friday prior to the April 9 incident in which her mother walked into her bedroom to find her sitting on the defendant's lap, the defendant put his finger and his penis in her vagina when she was in her mother's bed and her mother was in the shower. She said that the defendant jumped when her mother came out of the shower, but she could not remember if her mother said anything to him at that time.

The victim testified she had never really liked the defendant, but she had no reason to lie about him. She said no one had told her what she should say during her trial testimony. On cross-examination, she acknowledged that the defendant had never threatened her or instructed her not to tell anyone about the abuse. She said she did not remember having testified in a preliminary hearing that the incidents happened once a week as opposed to every day. She was also unable to remember having previously said that she pretended to be asleep when the defendant came into the room or that the incident in her mother's bed occurred about a week before the April 9 incident. On redirect examination, she agreed that

she was doing her best to recall events that had transpired three years before and that she would never intentionally not tell the truth.

The thirty-three-year-old defendant testified that he was a high school graduate and a decorated Navy veteran. He said he was living and working in Chattanooga before and after his November 1999 marriage to [the victim's mother] but, at her request, quit his job in January 2000 in order to move to Kingsport to live with her and her children. He adamantly denied that he had ever touched the victim in any inappropriate manner and gave the following version of the events that transpired on April 9, 2000. On that evening, he stopped by the victim's room after doing the laundry, took her on his lap, and began talking to her about not giving her mother a hard time while he was away from home attending a funeral. As he talked to her, his hands were on top of her legs, her hands were interlaced with his, and he was patting her on the top of her legs. After requesting permission, the defendant stood and demonstrated the position during his testimony. He said that [the victim's mother] called to him a few times and he answered that he would be there in a minute. She then came into the room, walked over to him, said, "I caught you, you son of a bitch," lifted the victim off his lap, and repeated, "I caught you, you son of bitch." He replied that he did not know what she was talking about and suggested that they discuss it in the hall.

When they reached the hall, [the victim's mother] grabbed his crotch and he said, "[I]f that's what you're talking about, I don't have an erection, as you see." At that point, she apologized, explaining that her hormones were "going crazy" and that she was "just emotional." They both then went upstairs and he ate his meal and kissed her goodbye before leaving for the funeral. When he returned later that evening, the house was dark and no one was home. As he was in the process of telephoning [the victim's mother]'s relatives to find out where she was, deputies pulled into his driveway and arrested him on an outstanding warrant for driving on a suspended license. According to the defendant, the charge was later dismissed.

The defendant testified that he agreed to the interview with Detective Booth because he wanted to clear up the matter. He explained that his statement that the victim was "real sexual" was in direct response to her question about whether the victim was sexual. He testified he added that the victim had been involved in a kissing episode at day care and had also been caught lying naked on top of another young girl, who was also naked, during a visit she had made to the other girl's home. The defendant denied that he ever told Booth that he cuddled with the children in bed. He

testified that he instead told her that, at [the victim's mother]'s request, he "went down every morning to sleep a little while longer with the kids, because she liked her morning time alone."

On cross-examination, the defendant testified that if he were guilty of the crimes, he would never have gone to trial but instead would have taken the eight years that had been offered by the State. He said that most mornings he got into bed and under the covers with the children and that he did not see anything inappropriate with the behavior. He denied that he ever put his hands between the victim's legs and said that Booth was lying when she testified that he had demonstrated, during his interview, having placed his hands on the victim's upper inner thighs.

State v. Bradley David Townsend, No. E2005-00115-CCA-R3-CD, 2006 WL 1439661, at *1-6 (Tenn. Crim. App. at Knoxville, May 25, 2006), perm. app. denied, (Tenn. Oct. 2, 2006).

On direct appeal of his convictions, one of the issues raised by the Petitioner was that the evidence was insufficient to support his convictions. Id. at *7. This court found the evidence sufficient. See id. at *7-8. The Petitioner also alleged that the trial court committed reversible error by not instructing the jury on misdemeanor assault and child abuse as lesser-included offenses of rape of a child and aggravated sexual battery. Id. at *8. The State argued that the Petitioner waived the issue because he failed to request the lesser-included instructions in writing as required by Tennessee Code Annotated section 40-18-110(c). Id. This court agreed with the State but addressed the issue under the plain error doctrine. Id. at *9. This court noted that five factors had to be present in order to find plain error: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused must not have waived the issue for tactical reasons, and (5) consideration of the error was necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the five factors set out in State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)).

In addressing the trial court's failure to instruct the jury on the lesser-included offenses, this court applied the three-step analysis set out in State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002), which involved a determination of (1) whether the offense was a lesser-included offense under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supported an instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constituted harmless error. Bradley David Townsend, No. E2005-00115-CCA-R3-CD, 2006 WL 1439661, at *9. This court first held that misdemeanor assault and child abuse were lesser-included offenses of rape of a child and that misdemeanor assault was a lesser-included offense of

aggravated sexual battery. Id. In the next step, this court determined that the evidence supported instructions on child abuse and misdemeanor assault as lesser-included offenses of rape of a child with respect to the April 7 incident and that the evidence supported an instruction on misdemeanor assault as a lesser-included offense of aggravated sexual battery with respect to the April 9 incident. Id. at *10-11. In the final step of whether the failure to instruct constituted harmless error, this court was unable to conclude beyond a reasonable doubt that no reasonable juror would have convicted the Petitioner of the lesser-included offenses. Id. at *11. However, this court noted that the Petitioner bore the burden of persuasion with plain error claims and that he had not shown that his failure to request the lesser-included instructions was not part of his defense tactics at trial. Id. at *12. This court, therefore, found that the trial court's failure to instruct the jury on the lesser-included offenses did not rise to the level of plain error. Id.

Our supreme court denied the Petitioner's application for permission to appeal, and he filed a timely petition for post-conviction relief. In his pro se petition and the amended petitions filed by counsel, the Petitioner alleged, relevant to this appeal, that he received ineffective assistance of counsel because trial counsel failed to request jury instructions on certain lesser-included offenses.

At the post-conviction evidentiary hearing, trial counsel testified for the Petitioner that he began practicing law in 1984 and retired in September 2017. Before the Petitioner's trial, trial counsel asked that the trial court charge every lesser-included offense. Trial counsel said that at that time, it was a defendant's constitutional right for the trial court to instruct the jury on all lesser-included offenses. Subsequently, but prior to trial, the legislature changed the law so that defendants had to ask for lesser-included offenses in writing. Trial counsel said that he intended to request that the trial court instruct the jury on specific lesser-included offenses such as child abuse and simple assault but that he never did so. Trial counsel raised the issue of the trial court's failure to instruct the jury on lesser-included offenses on direct appeal of the Petitioner's convictions.

On cross-examination, trial counsel acknowledged that the defense's theory was that "none of his happened." He said that the victim's story "just didn't add up" and that he thought the jury would acquit the Petitioner of all twenty-two counts. Instead, the jury acquitted the Petitioner of twenty counts of rape of a child, which trial counsel thought was a "compromised verdict." Trial counsel denied that part of his trial strategy was to have the trial court instruct the jury only on the charged offenses. He explained,

It's always been my opinion that in a situation like this you have so many counts in a sex case that many times juries compromise and for that reason I always want as many lesser included offenses [as] I can get because I

- 10 -

want them, if they are going to compromise, I want them to compromise as low as possible. I never want it to be all or nothing.

Trial counsel said that after the victim's mother witnessed the April 9 incident, the family sat down and ate a meal as if nothing had happened. Trial counsel used that to support the Petitioner's defense. Trial counsel said that he thought the allegations against the Petitioner were "a fabrication." He acknowledged that there was no physical evidence against the Petitioner and that he "significantly undermined" the credibility of the victim's mother during her cross-examination.

After the hearing, the post-conviction court entered a written order denying the petition for post-conviction relief. First, the court found that trial counsel rendered deficient performance by failing to request instructions on lesser-included offenses in writing. The court then considered prejudice, i.e., "whether a reasonable probability exists that a properly instructed jury would have convicted the petitioner of the lesser-included offense instead of the charged offense." Moore v. State, 485 S.W.3d 411, 420-21 (Tenn. 2016). In doing so, the court used the analysis set forth in Allen, which provided that courts "should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." 69 S.W.3d at 191. The post-conviction court determined that no reasonable probability existed that a properly instructed jury would have convicted the Petitioner of child abuse instead of aggravated sexual battery for the April 7 incident or of misdemeanor assault instead of aggravated sexual battery for the April 7 or April 9 incidents. Accordingly, the post-conviction court concluded that trial counsel's deficient performance was harmless beyond a reasonable doubt and, therefore, that the Petitioner failed to show prejudice.

## II. Analysis

The Petitioner challenges the post-conviction court's denial of his petition. The State asserts that the post-conviction court properly denied the Petitioner's claim of ineffective assistance of counsel because he failed to demonstrate any reasonable probability that a jury would have convicted him of child abuse or misdemeanor assault if the trial court had instructed the jury on such lesser-included offenses.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be

resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Whether a petitioner has suffered prejudice resulting from his counsel's failure to request proper jury instructions depends on whether a reasonable probability exists that a properly instructed jury would have convicted the petitioner of the lesser-included offense instead of the charged offense. Moore, 485 S.W.3d at 420-21 (citing Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008)). The prejudice inquiry on post-conviction mirrors the harmless error inquiry on direct appeal. Moore, 485 S.W.3d at 421. In cases where the jury did not reject the immediately lesser offense, or was given no option to convict of any lesser-included offense, courts apply the harmless error analysis adopted in Allen, 69 S.W.3d at 191. Id. at 422.

> Under the Allen analysis, courts "should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's

theory of defense, and the verdict returned by the jury." In examining the evidence presented at trial, the harmless error analysis focuses on the distinguishing element between the greater and lesser offenses, the strength of the evidence of the distinguishing element, and the existence of contradicting evidence of the distinguishing element.

Id. (footnote and internal citations omitted).

Turning to the instant case, the post-conviction court found that trial counsel was deficient for not requesting the instructions on the lesser-included offenses. We agree with the post-conviction court. Trial counsel testified that he was aware of the amendment in our Code that required a written request for lesser-included offenses, that he intended to make such a request, and that he simply failed to do so. He also denied that his not making the request was part of his trial strategy and explained that in a "sex case" with "so many counts," he never wanted a jury to be instructed on "all or nothing" because the jury could render a "compromised verdict." In his opinion, the jury returned a compromised verdict in this case. Accordingly, trial counsel was deficient for not requesting the lesser-included offenses.

As to prejudice, the Petitioner was charged with rape of a child for the incident in the bed on April 7, but the jury convicted him of aggravated sexual battery. Using the Allen analysis, the post-conviction court concluded that there was no reasonable probability that a jury would have found the Petitioner guilty of child abuse instead of aggravated sexual battery. The record supports that determination.

Relevant to this case, rape of a child is the unlawful sexual penetration of a victim by the defendant if the victim is less than thirteen years of age. Tenn. Code Ann. § 39-13-522(a). Aggravated sexual battery is unlawful sexual contact with a victim by the defendant when the victim is less than thirteen years of age. Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Child abuse occurs when a person knowingly, other than by accidental means, treats a victim in such a manner as to inflict injury. See Tenn. Code Ann. §§ 39-15-401(a).

Dr. Williams, the physician who examined the victim, found no signs of bleeding or bruising on the victim and no abnormal dilations of her vagina or anus. Although Dr. Williams found a small tear to the victim's hymen, he indicated that it "could [have] happen[ed] a multitude of different ways." Id. Moreover, the jury obviously discredited the victim's claim that the Petitioner penetrated her vagina on April 7. Therefore, the

- 13 -

Petitioner has failed to show that, but for trial counsel's deficiency, the jury would have convicted him of child abuse as a lesser-included offense of rape of a child.

The post-conviction court also determined that there was no reasonable probability that a jury would have found the Petitioner guilty of misdemeanor assault instead of aggravated sexual battery for the April 7 incident. Misdemeanor assault occurs when a person intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative. See Tenn. Code Ann. § 39-13-101(a)(3).

Although the victim testified that the Petitioner penetrated her vagina with his penis and his finger on April 7, the victim's mother testified that she did not see the Petitioner doing anything to the victim in the bed and that the victim claimed the Petitioner last penetrated her on April 3. The jury discredited the victim's claim of penetration but found that the Petitioner had unlawful sexual contact with her and convicted him of the only lesser-included offense charged to the jury, aggravated sexual battery. However, given the proof, a properly instructed jury could have found the Petitioner guilty of misdemeanor assault. Therefore, we must conclude that the trial counsel's failure to request an instruction on misdemeanor assault as a lesser-included offense of rape of a child in count twenty-one was prejudicial to the Petitioner and that he received the ineffective assistance of counsel. Accordingly, the Petitioner's conviction of aggravated sexual battery in count twenty-one is reversed, and the case is remanded to the trial court for a new trial.

As to the incident on the Petitioner's lap on April 9, the Petitioner was charged and convicted of aggravated sexual battery. The post-conviction court determined that there was no reasonable probability that a jury would have convicted the Petitioner of misdemeanor assault instead of aggravated sexual battery. Again, the record supports that determination. The Petitioner's defense was that the victim's mother fabricated the allegations against him. However, the Petitioner's two convictions share a significant commonality in that they were witnessed to some degree by the victim's mother and she corroborated the victim's testimony. The victim's mother testified that she saw the Petitioner rubbing the victim's vagina over her clothes and that he had an erection. Thus, the State presented proof that the Petitioner's unlawful sexual contact with the victim on April 9 was for the purpose of sexual arousal or gratification. Therefore, we agree with the post-conviction court that the Petitioner has failed to show that, but for trial counsel's deficiency, the jury would have convicted him of misdemeanor assault as a lesser-included offense of aggravated sexual battery.

### III. Conclusion

The judgment of the post-conviction court is affirmed as to the Petitioner's conviction of aggravated sexual battery in count one but reversed as to count twenty-one.

The case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE